**Stanley SHARP et al.**

v.

**COOPERS & LYBRAND.**

No. 75–1313.

United States District Court,
E. D. Pennsylvania.

Sept. 27, 1978.

See also D.C., 70 F.R.D. 544.

Theodore R. Mann, Mann & Ungar, Philadelphia, Pa., for plaintiffs.

Matthew J. Broderick, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Plaintiffs, investors in an oil drilling venture, alleged in this class action that the defendant, a major accounting firm, is liable to them for misstatements in several opinion letters which advised them as to the supposed tax consequences of those investments. Four theories of liability have been advanced by the plaintiffs: (1) liability for violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by employees of the defendant (Count One); (2) liability as a controlling person of its employees under § 20(a) of the Securities Exchange Act (also Count One); (3) fraudulent misrepresentations by defendant's employees (Count

Two); and (4) negligent breach by employees of the defendant of their common law duty owed to plaintiffs (Count Three). We have pendent jurisdiction over the last two claims.

We certified a class consisting of all persons who purchased these securities after July 22, 1971, 70 F.R.D. 544 (E.D.Pa.1976). There ensued an apparent novelty in our jurisprudence: a jury trial of issues common to the class under the Rule 10b–5, § 20(a) and pendent claims. These issues included foreseeability of damages, the exercise of reasonable care, whether there were misrepresentations and omissions and, if so, their materiality and scienter, and whether the defendant controlled an employee for § 20(a) purposes and adequately supervised him. We bifurcated the trial, and individual issues such as reliance, amount of damages and statute of limitations defenses have not yet been tried. After the jury returned answers to special interrogatories, plaintiffs moved for judgment n. o. v. with respect to one of those answers and to vacate the judgment as to Count Three (negligence), and the defendant moved for judgment on all counts in accordance with those answers, for judgment n. o. v. on the fraud and Securities Exchange Act counts and for a new trial on various grounds. We will grant only the plaintiffs' motion to vacate the judgment as to Count Three.

## I. FACTS AT TRIAL:

Plaintiffs are persons who purchased limited partnership interests in oil wells to be drilled in Kansas and Ohio, of which Westland Minerals Corporation (WMC) was general partner and promoter. As a result of criminal fraud by WMC, many of these wells were never drilled and much of the invested money was diverted to WMC's own use. Economic Concepts, Inc. (ECI), the selling agent for these limited partnerships, and WMC sought to engage in April 1971 the services of defendant in rendering opinions as to the federal income tax consequences of these limited partnerships. In July the defendant decided to write such

opinion letters, and on July 22, 1971, an opinion letter signed by a Coopers & Lybrand partner in its name was sent to Charles Raymond, president of WMC, stating that "based solely on the facts contained [in the WMC Limited Partnership Agreement] and without verification by us" a limited partner who contributed $65,000 in cash could deduct approximately $128,000 on his 1971 tax return. That letter was drafted by defendant's employee Herman Higgins, who was at that time a tax supervisor working directly under the supervision of four partners of defendant. The letter was written specifically for the use of one Muhammed Ali, a potential WMC investor, with regard to reducing the amount of taxes that would be withheld from a fight purse. In early October 1971 Higgins told David Wright, a partner in the defendant firm, that copies of the July 22 letter had been shown to individual investors besides Ali, and Wright determined that a letter which would be seen by other investors should be more complete. Higgins redrafted the opinion letter, and on October 11, 1971, defendant sent another opinion letter, signed in defendant's name by Wright, and a covering letter to Raymond.

The jury found that the October 11 letter contained both material misrepresentations and material omissions, and that Higgins acted either recklessly or with intent to defraud in preparing the letters. Much of the evidence concerning those misrepresentations and omissions and their recklessness came from plaintiffs' expert witness, Professor Bernard Wolfman of the Harvard Law School, a specialist in federal income taxation. Most of his testimony was not rebutted by the defendant. Professor Wolfman explained the principles behind this tax shelter: a taxpayer who in 1971 contributed $25,000 to a partnership involved in a bona fide oil drilling venture, which then obtained for each $25,000 contribution an additional $25,000 bona fide bank loan that was fully secured by partnership property (the as yet undrilled wells) and then expended all of that $50,000 for drilling, could under the law applicable in 1971 deduct the full $50,000 from his taxable

income. The effect would be to accelerate the tax deduction available to the investor in 1971. Professor Wolfman's expert testimony in concert with other evidence provided the basis for the jury's findings that the October 11 letter misrepresented or omitted to state material facts in at least three ways.

*First*, Professor Wolfman testified that writing such a letter was reckless on its face in that it omitted to state that the non-recourse loan which the letter assumed lending institutions would make to WMC, the value of which loan would be deductible by the taxpayer according to the opinion letter, would have to be secured by collateral (*i. e.*, the oil wells) whose value was equal to or greater than the amount of that loan. Non-recourse loans of the type contemplated by the opinion letter (*i. e.*, with no personal liability to the limited partners) are very rarely entered into by banks for oil drilling ventures, according to Professor Wolfman, because it is hard to secure them fully by undrilled wells, whose value is not known. Unless the value of the property used by the partnership to secure the loan were equal to the amount of the loan, Professor Wolfman explained, the amount of the loan would not be deductible to the limited partner under § 752(c) of the Internal Revenue Code. To assume this unlikely fact that the loans would be thus secured without stating the assumption was itself reckless, he said.

*Second*, the plaintiffs introduced evidence, principally through Higgins' testimony before a grand jury, that at the time Higgins drafted the October 11 letter he was aware of a number of facts because of his close relationship with ECI and WMC. In particular, this evidence suggested that Higgins as of October 11: (a) had recommended to WMC that it take the bank loans through mere bookkeeping transactions "without having to make a bank loan in the normal sense that we think of," (b) knew that WMC had acquired a bank, International Bank & Trust of the Bahamas (IBT), (c) knew that IBT was insolvent, or at least unable to make the loans necessary to fund

the oil drilling ventures contemplated by the WMC limited partnership agreements and (d) knew that the actual drilling costs for each limited partnership would be less than $140,000. Higgins testified at his deposition that, while under the transaction contemplated by this "paper loan" WMC would not have access to the money it would "borrow" from IBT, that was "not a difference . . . that in my opinion would be that critical from the tax point of view." As it turned out, many of these facts were untrue as a result of WMC's fraud.

Professor Wolfman stated that if the writer had made such a recommendation and was aware of these facts, the October 11 letter contained a number of misstatements: that the driller would receive $140,-000 in cash, that there would be partnership borrowing and that such borrowing would be from a suitable bank or other lending agency. These misrepresentations, which the jury could have found were intentional or at least reckless, in turn rendered the opinion as to tax consequences a misrepresentation, again at best recklessly made, because it was based on assumptions known to be false.

*Third*, the plaintiffs established that as of October 11 Higgins had decided to leave defendant's employ and that he had as of October 8 taken a leave of absence and was remaining there only to finish the opinion letter. There was evidence that by October 6 Higgins was working closely with ECI, WMC's selling agent, and on October 16 he got powers of attorney from Raymond to execute and file papers for WMC, of which Raymond was president, and for IBT, of which he was board chairman. Professor Wolfman testified that it was improper for an employee of an accounting firm who was employed by ECI to write a tax opinion letter and that the failure to disclose his relationship with the selling agent would be a material omission which would appear to have been intentional or reckless.

The jury concluded that, while Higgins caused the material misrepresentations and omissions in the October 11 letter recklessly or with an intent to defraud, no partner of the defendant firm caused any misstatements with such scienter. It also found no misrepresentations or omissions in the July 22 letter, so that liability is limited to those relying on the October 11 letter. With respect to the plaintiffs' negligence claim, the jury determined that defendant failed to exercise reasonable care but said that it was not foreseeable to the defendant that plaintiffs would be injured as a result of its negligent misrepresentations. With respect to common law fraud, the jury determined there was clear and convincing proof that the misrepresentations and omissions were made recklessly but not that they were made with knowledge and intent to deceive. Again, liability can arise only from reliance on the October 11 letter. The responses to interrogatories under § 20(a) of the Securities Exchange Act were that the defendant had the power to control Higgins' wrongful activities and that its good-faith defense of reasonably adequate supervision of Higgins had not been made out.

## II. COMMON LAW NEGLIGENCE:

After considerable dubitation as to whether the defendant could owe a duty to the plaintiff investors to exercise reasonable care in writing its opinion letters, we charged the jury and included interrogatories as to negligence. The questions we deemed common to the class were the existence of a duty to the plaintiffs and the defendant's standard of care. After the jury found that the defendant was negligent but that the named plaintiff's injury was not foreseeable to it, we entered judgment for the defendant on Count Three on the ground that defendant owed no duty of reasonable care to plaintiffs whose injury was not foreseeable. Plaintiffs have moved for judgment n. o. v. on the foreseeability issue and assert they should be allowed to pursue individual damage claims on a negligence theory.

■ There looms a threshold question of what common law governs as to this pendent claim. As a federal court exercising pendent jurisdiction, we are bound to in-

voke the choice of laws rules of the forum state, 1A *Moore's Federal Practice* ¶ 0.305[3] at 3056 (1977), at least where there is direct authority from the highest court of a state. *Cf. Towner v. Commissioner of Internal Revenue,* 182 F.2d 903, 907 (2d Cir.), *cert. denied, sub nom. Estate of Farrell,* 340 U.S. 912, 71 S.Ct. 293, 95 L.Ed. 659 (1950). The controlling Pennsylvania choice of laws principle in tort cases generally is that enunciated in *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), that the law of the state bearing the most significant relationship with the occurrences and parties in a case ought to be applied. Neither party has argued on these motions that the selection of applicable state law is significant or that a particular state law should apply. We believe, to the contrary, that determining whose law applies might be crucial to the liability of the defendant under the negligence claim on the issue of duty.

Our difficulty with making a choice of law analysis at this point is that we do not yet know in the case of each individual plaintiff which state has the most significant relationship with the occurrences and the parties. Normally, in a tort case this will be the state in which the injury occurred. However, individual cases may contain individual factors which could cause us, under Pennsylvania's choice of law rules, to look to a state other than the state of injury.

But even if we were to reach the usual result in tort cases and apply the law of the state of injury, we still do not know which law to apply since on this record we do not know the state in which each of the individual plaintiffs was injured. That the interests of more than one state are involved is inevitable. The problem is that we do not know on this record how many or which states are involved with respect to each plaintiff's claim. Therefore, any discussion of the law of any given state at this time would be both premature and futile. Since the pendent common law claims involve several state law questions, such as the duty of accountants to third persons, reliance, statute of limitations defenses and

damages, it is manifestly impossible for us to decide those questions as to each individual state until we first determine which state law to apply.

 The plaintiffs have moved for judgment n. o. v. with respect to the jury's finding that the defendant could not foresee that the named plaintiff would be likely to be injured by its negligence. Whatever its merits, we are unable to consider this motion because the plaintiffs did not move for a directed verdict under F.R.Civ.P. 50(a) as to foreseeability or as to Count Three generally. A motion for judgment n. o. v. based on a ground not raised in a party's motion for a directed verdict cannot be granted. *C. Albert Sauter Co., Inc. v. Richard S. Sauter Co., Inc.,* 368 F.Supp. 501, 509 (E.D.Pa.1973); 5A *Moore's Federal Practice* ¶ 50.08, at 50–86 & n.3 (1977). The Third Circuit has interpreted strictly the requirement of F.R.Civ.P. 50(b) that a motion for a directed verdict after the presentation of all evidence is a prerequisite to a motion for judgment n. o. v. *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193 at 1195 n.4 (3d Cir. 1978); *Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken,* 536 F.2d 9 (3d Cir.), *cert. denied,* 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976); *Beebe v. Highland Tank and Manufacturing Co.,* 373 F.2d 886 (3d Cir.), *cert. denied sub nom. National Molasses Co. v. Beebe,* 388 U.S. 911, 87 S.Ct. 2115, 18 L.Ed.2d 1350 (1967). *See also* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2537, at 596–98 (1971). Indeed, to entertain the plaintiffs' motion might deprive defendant of its Seventh Amendment rights to a trial by jury on Count Three as to foreseeability. *Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken,* 536 F.2d at 11; *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 846 n.17 (5th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976), *citing Slocum v. New York Life Insurance Co.,* 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879 (1913). The importance of the policies served by the Rules and the Seventh Amendment forbids us under the law of this circuit to consider plaintiffs' arguments in chambers that plaintiffs'

injuries were as a matter of law foreseeable as curing the failure to move for a directed verdict as to that interrogatory on that basis. *Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken* 536 F.2d at 12 & n.7. The plaintiffs' motion for judgment n. o. v. therefore will be denied.

■ Although we cannot grant plaintiffs' motion, we conclude nevertheless in light of the uncertainty as to what state law applies that judgment should not have been entered as to any plaintiff on Count Three. For at least some plaintiffs, the lack of privity with defendant might not foreclose the existence of a duty. Similarly the non-foreseeability found by the jury might not foreclose all plaintiffs. It is possible that under the law of some states, foreseeability is not required to impose a duty on accountants to exercise reasonable care. More likely, some states may impose liability on accountants for negligence to all persons whom the accountants foresaw or should have foreseen would have *used* or would have *relied* on the opinion letter rather than those whose injury was foreseeable. *See Restatement (Second) of Torts* § 552 (1965) (limiting liability for negligently supplied false information without direct reference to foreseeability) and Illustrations 5, 6. Because there is no legal or factual finding which forecloses all plaintiffs from recovery on Count Three, we will vacate our judgment for defendant on that count.

## III. COMMON LAW FRAUD AND FORESEEABILITY:

■ Defendant contends both that the jury's finding of non-foreseeability of injury compels judgment in its favor on Count Two, alleging fraudulent misrepresentation, and that it is entitled to judgment n. o. v.

because there was no evidence of its scienter. We are again thrust into a situation in which we cannot decide what state law to apply without knowing with regard to each plaintiff all the states, laws and interests involved, and we are therefore unable to grant the defendant's motions at this time.

## IV. HIGGINS' RULE 10b–5 VIOLATIONS:

### A. Foreseeability and Rule 10b–5.

■ The jury determined that Herman Higgins made material misrepresentations and omissions in the October 11 opinion letter either recklessly or with intent to defraud. The defendant advances several grounds why it is entitled nonetheless either to a verdict in its favor on Count One, alleging violation of Rule 10b–5 under § 10(b) of the Securities Exchange Act, or to a new trial on that count. Among these is the contention that the jury's finding of non-foreseeability of injury compels such a judgment in order to make the verdict on all counts consistent with the jury's answers to interrogatories, and that we must take the view of the case that renders these answers consistent, *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).[1] Underpinning this argument is a failure to ask the crucial question, "foreseeability of *what*?" and to make distinctions among the various possible answers. The foreseeability which is required under Rule 10b–5 is not foreseeability that a plaintiff might be injured, but merely that the defendant knew or should have known the opinion letter would be promulgated to investors.

■ The defendant is correct, however, in stating that the Third Circuit requires

1. Plaintiffs contend that we cannot consider the defendant's motion with respect to the lack of foreseeability under the securities law count because that ground was not raised in the defendant's motion for a directed verdict pursuant to F.R.Civ.P. 50(a) or in its motion for judgment n. o. v. under F.R.Civ.P. 50(b). It is true, as we noted in Part I, *supra*, that allowing the grounds raised in a motion for judgment n. o. v. to exceed those advanced in a motion for a directed verdict would violate Rule 50 and

might affront the Seventh Amendment rights of the non-moving party as well. This argument fails to recognize, however, that the defendant's motion on this ground is for judgment *in accordance with* the verdict, notwithstanding it. No constitutional and Rule 50 problems are created by permitting such a motion to be made and to raise issues for the first time after trial, and there is no requirement in Rule 50 as to such motions. Indeed, when else could such a motion be made?

foreseeability as an element of a 10b–5 claim. In *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 168 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), the court held that an accountant's alleged misstatements in reports could not be the basis of a 10b–5 action because

> "None of the directors' reports was made in a manner reasonably calculated to influence the investing public [and there] is no proof that any were disseminated to the public or that any investor saw them except for Landy, a director and counsel for the bank."

*See also Wessel v. Buhler*, 437 F.2d 279, 282 (9th Cir. 1971); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860–62 (2d Cir. 1968) (en banc), cert. denied sub nom. *Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1976). As we concluded in *SEC v. Penn Central Co.*, 450 F.Supp. 908, 912–13 (E.D. Pa.1978), the "in connection with" requirement of Rule 10b–5 [2] imposes in these cases the limitation that defendants can be liable for misrepresentations and omissions only if the defendants reasonably could foresee that these misstatements would be used in connection with the purchase or sale of a security—*i. e.*, would go to a class of persons (including the plaintiff or plaintiffs in a private damage action) for their consideration in deciding whether to purchase or whether to sell securities. *Accord, Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 815 (2d Cir. 1975). Defendant points to no evidence, nor could it, suggesting non-foreseeability in this sense. We hold as a matter of law that the defendant foresaw and reasonably could foresee that the October 11 opinion letter would be shown to potential investors in WMC limited partnerships, and we therefore conclude that this letter was used in connection with the purchase of those partnership interests.[3]

In so holding, we conclude that an accounting firm's rendering of opinions to a client as to the tax consequences of purchases and sales of the client's securities, where the firm is or should be aware the opinion will be disseminated to potential purchasers and sellers of those securities, is analogous for Rule 10b–5 purposes to preparing or certifying financial statements which it actually or constructively knows will be used in the same way. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 n.33, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976) ("experts who perform services or express opinions with respect to matters under the [Securities Exchange] Acts"); *Gold v. DCL Inc.*, 399 F.Supp. 1123, 1127 (S.D.N.Y.1973).

The other cases from this circuit cited by defendant for the proposition that foreseeability of loss is necessary in a 10b–5 case are not relevant to this motion. The court in *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 194 (3d Cir. 1976), discussed the requisite of a causal connection between fraudulent conduct and a purchase or sale of securities and concluded that the defendants' fraudulent refusal to sell stock had an insufficient causal nexus with plaintiffs' stock purchases. Similarly, Judge Adams held in *Ketchum v. Green*, 557 F.2d 1022, 1027 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977), that the fraud-sale of securities relationship was too attenuated in a case involving an intra-corporate struggle for control. In our case the causal nexus takes a classic form, between an accountant's misrepresentation and purchases of securities, and causation follows from objective materiality, which has been proven, and subjective reliance, which has not been at issue in the trial thus far.

■ The other main line of authority invoked by the defendant involves the limi-

---

**2.** The rule proscribes fraud "in connection with the purchase or sale of securities." 17 C.F.R. § 240.10b–5.

**3.** The same evidence which compelled our finding as a matter of law that defendant foresaw WMC's use of this letter to show to investors leads us to find as a matter of law that this

opinion was in connection with the purchase or sale of a security. Defendant contends we erred in thus holding the "in connection with" requirement of Rule 10b–5 was met and contends that as a matter of law this element was lacking, but has cited no authority for that proposition.

tation of damages recoverable in a Rule 10b–5 action to those proximately caused by defendants' fraud. Courts have mentioned foreseeability of injury in that context, *e. g., Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357, 1361 (8th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978); *See also Miller v. Schweickart,* 413 F.Supp. 1062, 1067–68 (S.D.N.Y.1976); 2 A. Bromberg, *Securities Law: Fraud, SEC Rule 10b–5* § 8.7(2), at 218 (1973) ("Foreseeability has a role to play in determining the measure of damages . . ."). To the extent that the jury's finding of non-foreseeability would be relevant to that issue, it cannot be deemed competent because the damages issue has not yet been tried and hence the plaintiffs were not required at the trial of common issues to prove proximately caused damages. What role, if any, foreseeability will play in that determination cannot be ascertained until a later date.

Defendant also relies heavily on *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), to impose a foreseeability requirement, mainly on the bases of (1) the Securities and Exchange Commission's proposed standard for recovery for negligent violations of Rule 10b–5, which the Court rejected in holding scienter is required, *id.* at 198 n.18, 96 S.Ct. 1375, and (2) the Court's citation of *Ultramares v. Touche, Niven & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931), *id.* at 215 n.33. The SEC proposed that a defendant's liability for negligence be limited to those persons whose *reliance* could be foreseen by the defendant, which requirement has been met here in any case. Moreover, there is no reason to expect that the Court, in rejecting the sufficiency of negligence for 10b–5 liability, in any sense adopted this limitation.[4] Nor should the citation of *Ultramares v. Touche, Niven & Co.,* in *Ernst & Ernst* and in *Blue*

*Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 747–48, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), suggest endorsement of a foreseeability rule. In both cases the Court echoed Chief Judge Cardozo's concern about the overbreadth of the class of plaintiffs to whom persons doing business might be liable, but neither opinion suggests limiting an accountant's liability to purchasers and sellers for *fraudulent,* as opposed to negligent conduct. Thus once there is a breach of a duty extending to persons beyond those in privity with an accountant, *i. e.,* once there is fraud and not mere failure to exercise reasonable care,

> "If the certified financial statements [or opinions] are intended to be used and are used, to the knowledge of the accountants, in the sale of securities by the company or someone else to the public, there would seem to be little question that the purchasers are persons entitled to complaint of that breach of duty, even under Cardozo's opinion in the *Ultramares* case which is discussed in *Ernst & Ernst.*"

R. Jennings & H. Marsh, *Securities Regulations: Cases and Materials* 1132 (1977).

### B. *Recklessness and Rule 10b–5.*

In moving for judgment n. o. v. and for a new trial, defendant takes the alternative positions that it is entitled to judgment because reckless conduct is not grounds for 10b–5 liability and that our charge as to recklessness erroneously defined that legal standard. The former position was rejected expressly by the Third Circuit in *Coleco Industries, Inc. v. Berman,* 567 F.2d 569 (3d Cir. 1977), where it held in accordance with other courts which had decided the issue, explicitly unresolved in *Hochfelder,* 425 U.S. at 194 n.12, 96 S.Ct. 1375, that recklessness is sufficient to impose such liability. Concluding that the

---

4. Indeed, the plaintiffs point out, it is unlikely that *Hochfelder* imposes any foreseeability requirement since the Seventh Circuit had concluded in the decision below that harm to persons in the plaintiffs' limited class was not an actually foreseen result of the accountants' negligence. 425 U.S. at 192 n.9, 96 S.Ct. 1375; 503 F.2d 1100, 1107 (7th Cir. 1974). The Court

equated that finding with *non-foreseeability of use* of the accountant's audit by the client. *Id.* at 215 n.33, 96 S.Ct. 1375. Had the Court deemed foreseeability of either sort necessary for liability under Rule 10b–5, its absence would have determined the case or at least ought to have been mentioned by the Court to support its holding.

defendants' conduct was not reckless under any of the judicial standards of recklessness, the Third Circuit in *Coleco* did not expound upon the precise standard defining the lower boundary of 10b–5 scienter. We derived our charge to the jury from the following definition of recklessness formulated in *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719, 725 (W.D.Okl.1976), and adopted by the Seventh Circuit in three of the recklessness cases cited in *Coleco*, 567 F.2d at 574 n.6:

> "[R]eckless conduct may be defined as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." (citations omitted)

We do not believe this formulation to differ fundamentally from the standard adopted by the district court in *Coleco*, 423 F.Supp. 275, 296 (E.D.Pa.1976), "a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception," and we originally attempted to incorporate the latter in our charge. We ultimately decided, however, that the *Coleco* language added little and that because of its legal rather than factual orientation (*i. e.*, degree of culpability) would have been more confusing than helpful to the jury. We believe that our charge correctly reflected the meaning of "recklessness" and that the record amply supported the jury's finding that Higgins made misrepresentations or omissions either with that mental state or with intent to defraud.

## C. WMC Partnerships as Securities.

 Advancing the contention that the WMC limited partnership interests were securities within the meaning of the Securities Exchange Act only if the purchasers of them intended to profit from the actions of others and not if they purchased them merely for tax shelters, defendant argues that we erred in holding these interests

were securities as a matter of law. *Cf.* § 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10). But the very cases cited by the defendant tend to refute the proposition that there is an equation between securities and defendant's narrow definition of profit motivation. Rather, the meaning of securities under this legislation should be and has been interpreted like that under the Securities Act of 1933, *see* 2 L. Loss, *Securities Regulation* 795–96 (1961), which the Supreme Court has held to embody

> "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

*SEC v. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The record clearly establishes that WMC partnership shares promised to investors "profits" in the broad sense meant by the Court, based on, *inter alia*, the tax consequences forecast by defendant. Moreover, courts have more recently reinforced and indeed broadened the doctrine that the definition of a security is "to be liberally construed under the federal securities laws," *Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd.*, 544 F.2d 1059, 1063 (10th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977), in view of the fact that remedial legislation such as these laws should be broadly construed. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). *See also Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093, 1098 (5th Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974).

## V. LIABILITY OF DEFENDANT FOR HIGGINS' RULE 10b–5 VIOLATIONS:

Even assuming Higgins violated Rule 10b–5 by misrepresenting and omitting to state material facts in the October 11 opinion letter, the defendant says it cannot be liable for those acts, particularly in light of the jury's finding that no partner in the

defendant firm caused the misrepresentations or omissions to be made. We concluded as a matter of law that the defendant should be held liable on the basis of *respondeat superior* for acts of Higgins committed in the scope of his employment with Coopers & Lybrand, and we framed interrogatories to the jury concerning defendant's secondary liability under § 20(a) of the Securities Exchange Act, the "controlling persons" provision. The defendant argues that it is entitled to judgment on Count One due to the inapplicability of agency principles to it and the lack of evidence to sustain a § 20(a) violation, and alternatively that there should be a new trial because our charge was erroneous as to these issues.

*A. Respondeat Superior.*

■ The Third Circuit held unequivocally in *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 884–86 (3d Cir. 1975), on the basis of the congressional intent behind the Securities Exchange Act that "the principles of agency, i. e., *respondeat superior*, are inappropriate to impose secondary liability in a securities violation case." *Id.* at 884. The plaintiff contends that the court undercut this holding in *Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761 (3d Cir. 1976), by suggesting that under *Rochez* there can be primary as opposed to secondary liability under *respondeat superior*. We do not believe that any such distinction exists, and we read *Gould* as reaffirming this aspect of *Rochez*, 535 F.2d at 778–79.

*Rochez* expressly limited this holding, however, as follows:

"We are not faced with the type of relationship that prevails in the broker-dealer cases where a stringent duty to supervise employees does exist. [footnote omitted]. This duty is imposed to protect the investing public and make brokers aware of the special responsibility they owe to their customers. We can find no reason to impose this same duty in a situation like the one presently before us where the parties were dealing for themselves and for their own accounts."

527 F.2d at 886. *See also Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 586 n.4 (3d Cir. 1975). We believe this carefully drawn limitation suggests that in this circuit broker-dealers are liable under normal agency principles for violations of securities laws by their employees in the course of their employment, and the Third Circuit's opinion in *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591 (3d Cir. 1976) supports that view. There the district court held a corporation liable for violations of § 10(b) and Rule 10b–5 based on, *inter alia, respondeat superior*, and the court, without specific comment on the propriety of agency principles, affirmed in light of the "company's active participation in the scheme, its receipt of the benefits, and its status as a broker-dealer." *Id.* at 596. *See also, e. g., Holloway v. Howerdd*, 536 F.2d 690, 695 (6th Cir. 1976); *Plunkett v. Dominick & Dominick, Inc.*, 414 F.Supp. 885, 887 (D.Conn.1976). Status as a broker-dealer imposes upon the principal a stringent duty of supervising its agents and is distinguishable from the status of corporations generally in this context principally in that the broker-dealer occupies a position of public trust: the function of it and its employees is to give independent advice concerning securities transactions and thereby to affect a large number of purchases and sales by the public of securities issued by a variety of corporations and partnerships, which effect is extremely sensitive to wrongdoing by employees of a broker-dealer in the course of their work, for which the corporate entity normally is compensated.

Employees of other kinds of corporations normally can influence transactions only in its own securities and on a less regular basis, and the public does not expect that any advice they give will be independent of the corporation's interest. More importantly, it is not the primary function of the principal to exert such influence, and the corporation hence has a far less substantial reason to be aware of or responsible for wrongdoing in connection with purchases or sales of securities, which will usually be at least a frolic, if not a detour, from the employee's duties. *See, e. g., Rochez*, 527

F.2d at 884–85. The Third Circuit in that case consequently declined to impose on corporations a duty to supervise and oversee the securities transactions of directors and employees of such corporations by applying *respondeat superior. Id.* at 885–86.

■ While we know of no case discussing the applicability of *respondeat superior* to accounting firms, we believe the "special duty" exception applies to them because their roles in securities transactions resemble more closely those of broker-dealers than those of corporations generally. *See* Ruder, *Multiple Defendants in Securities Law Fraud Cases*, 120 U.Pa.L.Rev. 597, 645–46 (1972) (defendant may be primarily liable because he or it "owe[s] a duty as an accountant or a stockbroker . . ."). We conclude that defendant here is liable for any conduct of Higgins which violated Rule 10b–5 occurring in the scope of his employment.[5] While it is true that the defendant (like accountants generally) did not deal with purchasers as directly as broker-dealers do, its task in writing over its signature on the October 11 opinion letter, which it delegated in large part to Higgins, was to render an independent opinion which would influence potential investors in WMC. Moreover, Judge Newman's observation in *Plunkett v. Dominick & Dominick, Inc.*, that "[h]olding the broker-dealer liable [for an employee's 10b–5 violation] allocates the risk of loss to the entity best able to prevent a loss and most able to sustain the monetary repercussions of the illegal act," 414 F.Supp. at 889, applies with equal force to accounting firms in situations such as this.

Higgins' misrepresentations were in a letter signed by a partner on defendant's behalf and came in the course of conduct for which the defendant was compensated. Professor Wolfman testified as to the high degree of care owed by accountants in such undertakings. Judge Frankel has noted, in holding an accounting *firm* had no duty to

disclose material facts where it had not itself made any representations or certification, that

"Where it gives an opinion or certifies statements, an auditing firm publicly assumes a role that carries a special relationship of trust vis-à-vis the public. The auditor in such a case holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable" [citations omitted].

*Gold v. DCL Inc.*, 399 F.Supp. at 1127. This special relationship and duty seem to us to justify under the *Rochez* rationale imposition of *respondeat superior* liability on an accounting firm for misrepresentations of an employee which, like those here, were expressed in a firm opinion. We note, finally, that a number of courts, including the Third Circuit, have discussed the liability of accounting *firms* under Rule 10b–5 for conduct (which of course can only be done by natural persons), apparently assuming the applicability of *respondeat superior. See, e. g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375; *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d at 815; *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d at 167–170; *Gold v. DCL Inc.*, 399 F.Supp. at 1127.

*B. § 20 Liability.*

Section 20 of the Securities Exchange Act provides:

"Liability of controlling persons.

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

---

5. That defendant here is a partnership whereas most of the authority on *respondeat superior* liability for securities laws violations by employees deals with corporate principals does not seem to us a distinction of any significance (so long as the violation was not by a partner), and neither party argues to the contrary.

On its face, the statute seems to make the existence of a controlling person-controlled person relationship sufficient to make out a prima facie case of liability, with a defense of good faith and non-inducement available to controlling persons. The Third Circuit's latest plenary discussion of § 20(a) in *Gould v. American-Hawaiian Steamship Co.* followed this approach when it said that two defendants, though controlling persons, could defeat liability if they could establish this two-fold statutory defense and noted the comparative benefit to plaintiffs of proceeding under § 20(a) relative to an aider-abettor theory, where the burden of proof would be on plaintiffs as to all elements. 535 F.2d at 779–781. *See also Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 824 (E.D.Wis.1977); Ruder, *Multiple Defendants in Securities Law Cases*, 120 U.Pa.L.Rev. 597, 602 (1972).

▮ Accordingly, we charged the jury first as to the law concerning whether defendant was a controlling person with respect to Higgins and framed the question as to whether Coopers & Lybrand "had the power or potential power to influence and control the activities" of Higgins. The jury decided it had that power. The courts have not stated explicitly whether the existence of this relationship *vel non* is a question of fact, as we believe it is, or of law. If it is the former, we believe we properly instructed and formulated the interrogatory to the jury under *Rochez,* and that its answer to the interrogatory was amply supported by the evidence. It stands as a finding that Coopers & Lybrand was a controlling person of Higgins with regard to the drafting of the WMC opinion letter. The project of writing that letter was, after all, firm business which was done under the direction of partners and for which the defendant was compensated. If this is a question of law, we hold likewise that defendant was a controlling person under the SEC's and this circuit's liberal construction of "control." *See Gould,* 535 F.2d at 779, and *Rochez,* 527 F.2d at 890, quoting and apparently adopting the SEC's definition, 17 C.F.R. § 240.-12b–2(f) ("the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person . . .").

▮ We next asked the jury whether the defendant exercised reasonably adequate and sufficient supervision over Higgins, on the premises that a showing of such supervision by defendant would make out the good faith aspect of the two-part § 20 defense just as it would for broker-dealers and that this was the only basis on the record for a good faith defense. *See Zweig v. Hearst Corp.,* 521 F.2d 1129, 1134–35 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Barthe v. Rizzo,* 384 F.Supp. 1063, 1069–70 (S.D.N.Y.1974); *Gordon v. Burr,* 366 F.Supp. 156, 168 (S.D. N.Y.1973), *rev'd in part on other grounds,* 506 F.2d 1080 (2d Cir. 1974); *Lorenz v. Watson,* 258 F.Supp. 724, 732–33 (E.D.Pa. 1966). The jury concluded defendant did not. Again we find this determination was supported by the evidence that, *inter alia,* David Wright (the partner who most directly was charged with supervising Higgins), never read the WMC limited partnership agreements or asked Higgins whether he had read them. Particularly in light of the fact that defendant bears the burden under *Gould* of making out this defense, we are unable to conclude that the jury simply made a mistake, as the defendant contends, and to hold as a matter of law that the defendant exercised reasonably adequate supervision.

▮ Defendant argues that we erred in not submitting to the jury the second half of a § 20(a) defense, *i. e.,* whether the defendant directly or indirectly induced Higgins' Rule 10b–5 violations. The plaintiff did not request such a charge and we did not put this issue to the jury because there was no evidence in this case of direct or indirect inducement, other than the undisputed fact that Higgins was doing firm business when he drafted the opinion letter. Whether that constitutes inducement under § 20(a) is a question of law, but we need not resolve it in light of the jury's finding and our conclusion that the other necessary half of a § 20(a) defense, good-faith, was not

made out. The statute and *Gould* make it clear that *both* parts of the defense must be made out for a controlling person to escape § 20(a) liability for a controlled person's violations.

The defendant complains that it is permitted to show and have jury findings as to *both* good faith *and* non-inducement. This argument turns the conjunctive structure of § 20(a) upside down. It is the *defendant* who must make out both elements of the *defense*, and the failure here to establish good faith precludes any need for inquiry into non-inducement, either by a jury or (as would be appropriate here) by a court in determining whether the undisputed facts amount to non-inducement. Where the resolution of an issue cannot affect the outcome of the case, a party has no "right" to have it determined. Hence the jury's findings are sufficient to impose § 20(a) liability on the defendant for Higgins' acts.

A more substantial challenge by defendant arises from a point in the Third Circuit case law construing § 20(a) which is at best ambiguous and at worst a mess. The defendant argues that our interpretation of the statute is inconsistent with that of the Third Circuit in *Rochez*, where it held "that secondary liability cannot be found under Section 20(a) unless it can be shown that the defendant was a culpable participant in the fraud." 527 F.2d at 890. *See also Gordon v. Burr*, 506 F.2d at 1086; *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973). This requirement appears to combine the statutory criteria of bad faith and inducement. In so doing, *Rochez* seems to create a new requisite for § 20(a) liability and to suggest, contrary to the statute on its face, that plaintiff bears the burden of demonstrating aspects of both bad faith and inducement to make out a prima facie case. This position was squarely rejected six months later by the *Gould* court, which did not overrule *Rochez* and indeed cited it approvingly. This conflict, or at best lack of clarity, within the Third Circuit leaves us somewhat confused as to the necessary elements of § 20(a) and as to burden of proof.[6] We believe that we must resolve that problem by giving primacy to *Gould*, the most recent pronouncement of that court as to these issues under § 20(a).[7]

Even under *Rochez*, however, we believe that our charge and interrogatories were correct. Even if "culpable participation" is required to make a prima facie case, we cannot agree with the defendant that the issue of its presence was properly a question for the jury. Certainly, culpable participation is a legal conclusion as well as a doctrine whose meaning at this stage, is, even to judges and lawyers, obscure to say the least. To instruct the jury adequately on the meaning of culpable participation would have been a difficult task; to ask it to pass on the matter would have been an abdication of our responsibility, particularly where the main facts of Coopers & Lybrand's role vis-à-vis Higgins were not in dispute (with the exception of the adequacy of its supervision, which the jury did pass upon). In *Rochez*, the court found a lack of culpable participation by the corporation where the violator, its president, acted for

---

6. This apparent confusion is perhaps best explained by the usual practice of non-jury trials in Rule 10b–5 cases, in which event the division between fact-finding and interpreting the law blurs and the importance of burden of proof diminishes. Courts thus can avoid this morass by finding either that *both* parts of a § 20(a) defense have been made out, in which case it is irrelevant whether the plaintiff did make out a prima facie case, or that there was culpable participation *and* the defenses were not established. Such findings render the burden of proof problem moot. In having to charge and frame interrogatories to a jury, we were not so fortunate.

7. A still more recent case, *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793 (3d Cir. 1978), cites *Rochez* for the proposition that a director may not be held liable under § 20(a) without culpable participation in the unlawful activity, at 804. We hesitate to hold that this two-sentence "discussion" of § 20(a) overrules the clear language of *Gould*, putting the burden on defendant to make out the dual defense once shown to be a controlling person, particularly in light of *Monsen's* limitation on its face to directors—for whom, it might well be, the "culpable participation" requirement makes more sense than it does in the case of corporations and partnerships.

himself and traded the corporation's securities on his own account, where the corporation did not benefit from his conduct and where its other employees all were purely ministerial. 527 F.2d at 891. Similarly, one of the Second Circuit cases from which *Rochez* gleaned the culpable participation requirement, *Gordon v. Burr,* was an instance in which the controlling person was far removed from the violation. There, a broker-dealer was deemed not to be a "culpably participating" controlling person of a salesman who violated the securities laws in sales which were not managed by the firm to a purchaser who was not a regular customer of the firm. 506 F.2d at 1685–86.[8] Another case relied on in *Rochez, Kamen & Co. v. Paul H. Aschkar & Co.,* 382 F.2d 689, 696–97 (9th Cir. 1967), *cert. granted,* 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129, *cert. dismissed,* 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968), is also distinguishable in that there the district court had found that both parts of the § 20(a) defense had been made out, good faith having been shown by due care in supervision.

▮ While we therefore have some idea of what constitutes a lack of culpable participation under *Rochez,* we are less informed as to what amounts to its presence. In *Straub v. Vaisman & Co.,* where the Third Circuit upheld a district court holding that a corporate broker-dealer was liable under § 20(a) as well as under *respondeat superior,* the court said only that such liability attached where the corporation's "role was not merely that of a facade for fraud, but rather one of a culpable confederate." 540 F.2d at 596. There the broker-dealer's "participation" in its president's fraud with respect to another company's securities consisted in its being a market-maker in those securities, a financial consultant to the other company and the employer of the salesman who advised the purchase of these

securities to plaintiff in a telex signed in the name of the corporation.[9] The court's analysis is brief and does not in any sense define the lower threshold of culpable participation. Surely defendant is incorrect, however, when it argues that it cannot be found to have been a culpable participant because the jury found that no partner (whose acts defendant seems to equate legally with its own) made misstatements recklessly or with an intent to defraud. To hold that such a finding bars § 20(a) liability would mean the section applies only where the controlling person's primary liability can be made out and thus would render § 20(a) a nullity. We reject the idea that Congress intended § 20(a) liability to be so narrow as to be virtually meaningless.

▮ The facts in this case are clearly distinguishable from the "no culpable participation" cases decided by and endorsed by the Third Circuit and amount in our judgment to significant involvement by the defendant in the fraud. It may be, first of all, that the defendant's failure to sustain its burden as to good faith is itself sufficient to reach the legal conclusion of culpable participation, where the employee who was inadequately supervised committed the primary violation. *See DelPorte v. Shearson, Hammill & Co., Inc.,* 548 F.2d 1149, 1154 (5th Cir. 1977); *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 438–39 (N.D. Cal.1968), *modified on other grounds,* 430 F.2d 1202 (9th Cir. 1970). In this case, moreover, at least three factors demonstrate defendant's culpable participation: (1) the misrepresentations and omissions were made by an employee in the scope of his work for the defendant partnership's rendering of professional services for which it was compensated, and were expressed in an opinion letter signed by a partner for the partnership; (2) that work was supposed to

---

**8.** The other Second Circuit case relied on in *Rochez, Lanza v. Drexel & Co.,* did not apply § 20(a) to specific facts.

**9.** We discount the significance of the district court's finding in *Straub,* noted by the Third Circuit in its decision, that the defendant corporation "had inside information . . . .", *id.*

at 594, because we do not understand what it means for a corporation to have information (*i. e.,* to "know" something), other than by the application of agency principles, any more than we see how a corporation can act other than through its agents. *See Rochez,* 527 F.2d at 884.

be supervised by partners, and the jury expressly found defendant failed to supervise it adequately; and (3) as a result of this inadequacy the defendant failed to make out its § 20(a) good faith defense. We concede that the defendant's involvement in the fraud, while significant and much closer than that in *Rochez* or *Gordon*, was somewhat less intimate than that of the defendant in *Straub*. We believe nevertheless that broker-dealers, accounting firms or other controlling persons with special relationships to the investing public are to be judged under more stringent standards in § 20(a) cases than corporations generally, *compare Zweig v. Hearst Corp.*, 521 F.2d at 1135, *with Hecht v. Harris, Upham & Co.*, 283 F.Supp. at 438–39. For such controlling persons, at least, these facts are sufficient to constitute "culpable participation" under *Rochez*.

## VI. OTHER GROUNDS FOR NEW TRIAL:

 Defendant also argues that we erred in admitting evidence that Coopers & Lybrand (Bahamas), an affiliate of defendant, knew of the insolvency of IBT, and that we erred in bifurcating the trial between the issues common to the class and the issues relating to individual damage claims.

The plaintiffs originally intended to demonstrate that Coopers & Lybrand (Bahamas) and the defendant were partners in an international accounting partnership, and that on the basis of that relationship the knowledge of the former could be imputed to the latter. After the plaintiffs made a prima facie case of such an existence of such a partnership, we admitted evidence as to the knowledge of the Bahamian firm as to IBT's insolvency. During trial, however, the plaintiffs withdrew the contention that such knowledge could be imputed on the basis of an international partnership, and

the defendant contends that the admission of that evidence prejudiced it. We reject this contention for two reasons.

First of all, the Bahamian firm's knowledge of IBT's insolvency was at least marginally relevant to two of plaintiffs' claims, aside from the attempt to impute that knowledge to the defendant. The plaintiffs sought to prove, but the jury rejected the contention, that David Wright, a partner of defendant, recklessly caused the misrepresentations in the October 11 letter, and the plaintiffs demonstrated that Wright had been contacted by the Bahamian firm with regard to the prospective acquisition of IBT by WMC. It was the plaintiffs' theory that Wright was reckless in not seeking information concerning IBT from the defendant's Bahamian affiliate. The evidence that that affiliate, as the auditor for IBT, learned before October 11, 1971, that the bank was insolvent was relevant under this theory in that it disclosed what Wright arguably would have learned had he opened such lines of communication. In addition, this evidence was relevant to the theory of Higgins' recklessness. The insolvency of IBT was significant as a fact that Higgins arguably either knew or was reckless in not finding out, in light of his intimate association with ECI and WMC, and the audit by Coopers & Lybrand (Bahamas) corroborated the fact of IBT's insolvency before the October 11 opinion letter was sent.

More importantly, however, we believe that any prejudice which might possibly have been done to defendant through the jury's attribution to it of the knowledge of its Bahamian affiliate was destroyed by our instructions to the jury in at least two separate places that it could not impute this knowledge to the defendant.[10] We believe that these clear and repeated instructions were effective, particularly in light of our conclusion, based on our observation and the answers to interrogatories in this ex-

10. It seems clear from the answers to interrogatories that the jury did not impute this knowledge to the defendant. It found the primary violation of Rule 10b–5, and it follows that the fraud and the negligence also were committed by *Higgins,* not by the defendant or any of its partners. The liability of the defendant for Higgins' acts follows from legal principles and the jury's findings that defendant controlled Higgins and did not adequately supervise him. We fail to see how the Bahamian evidence could have affected any of these findings.

tremely complicated case, that this jury was an uncommonly intelligent one. Consequently, even if the Bahamian evidence were irrelevant, its admission was not error because no substantial right of the defendant was adversely affected by its admission. F.R.Ev. 103(a).

The defendant also contends that we abused the broad discretion vested in us by F.R.Civ.P. 42(b) and Rule 7(f)(10) of the Local Rules of Court for the Eastern District of Pennsylvania to separate issues for trial by bifurcating in this case the liability issues common to the class from those which would differ for each individual class member. *Compare Lis v. Robert Packer Hospital*, 579 F.2d 819 (3d Cir. 1978). Bifurcation along these lines is unavoidable in a securities class action, and courts have uniformly permitted class actions to proceed in such cases. *See* 3B *Moore's Federal Practice*, ¶ 23.45[3] at 23–348, 23–349 & nn.33, 34 (1978) (citing cases). Defendant did not cite in its brief supporting a motion for a joint trial any authority suggesting the impropriety of bifurcation in a securities fraud case. The principal argument of the defendant is that bifurcation is impermissible in cases where the damages and the liability issues are "so interwoven . . . that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." *Gasoline Products Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). Here, to the contrary, we believe that the factual parts of the individual reliance and damages issues with a brief explanation of the first jury's findings will be comprehensible to a factfinder.

To hold otherwise in a securities fraud case would make it so difficult and costly for plaintiffs to prove their cases as to diminish significantly "the ultimate effectiveness of the federal remedies" provided in these laws. 3 L. Loss, *Securities Regulation* 1819 (1961). This analysis also applies to bifurcation of liability and damages under the common law fraud count.[11] We conclude that bifurcating this trial was and will be, as well as the most efficient and perhaps the only practical way to try the suit, neither confusing to the factfinder at either stage of the case nor prejudicial to either party.

For the reasons discussed above, we will deny defendant's motions for judgment in accordance with the verdict, for judgment n. o. v. and for a new trial.

---

11. The defendant also maintains that we erred in not submitting to this jury the questions of materiality and reliance under common law fraud. Clearly, reliance is an individual issue under Count Two just as it will be under Count One (if defendant chooses to rebut the presumption of reliance which apparently applies under Count One). To the extent materiality implies an objective test under state law, and hence one that is common to all plaintiffs, the jury's finding that the misrepresentations and omissions in the October 11th letter were material by Rule 10b–5 standards compels the conclusion that they were material for purposes of Count Two. *See Restatement (Second) of Torts* § 538(2)(a); W. Prosser, *The Law of Torts* § 108, at 718–19 (1971). To the extent that the materiality of a fraudulent misrepresentation depends upon the state of mind of each individual who received the misrepresentation (*i. e.*, would this plaintiff have acted differently were it not for the fraudulent misrepresentation?), materiality properly was reserved for the individual damage trials.