Albert H. GOLD, Plaintiff,

v.

DCL INCORPORATED et al.,
Defendants.

No. 72 Civ. 4193.

United States District Court,
S. D. New York.

June 29, 1973.

Silverman & Harnes, New York City, for plaintiff.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendants DCL Incorporated, John Diebold, John J. Graham, Donald C. Cook, Donald J. Dona-

hue, John W. Larsen, Thomas W. Russell, Jr., Paul Vincent, and Ralph E. Weindling.

Cravath, Swaine & Moore, New York City, for defendant Price Waterhouse & Co.

## OPINION

FRANKEL, District Judge.

The plaintiff, a lawyer and experienced investor, claims to have been misled by material omissions affecting certain stock purchases so that he lost money rather than winning, as he had hoped to do. In a now common kind of action, he sues for himself and his alleged class under §§ 10(b), 20, and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and 78aa (1970), and Rule 10b–5, 17 C.F.R. § 240.10b, issued thereunder.

The securities involved are the common shares of defendant DCL Incorporated, of which plaintiff bought 500 on February 10 (at $10⅜), 500 on February 14 (at $10), and 1,000 on March 13, 1972 (at $9½).

DCL is in the business of short-term leasing of computers, primarily the System/360 series which it purchases from IBM. The short leases which DCL must offer to remain competitive with IBM do not afford sufficient return to recoup the purchase price of the computers. Consequently, it is essential that DCL remarket its equipment by securing lease renewals or new lessees, or by selling its computers. Obsolescence of a computer "portfolio," as the inventory appears to be called, is a major industrial threat to a remarketing program. It was, therefore, a matter of potential concern for DCL that in 1970 IBM announced its intention to introduce a new, more powerful computer line, the System/370.

During the year 1971 and until February 15, 1972, defendant Price Waterhouse & Co. served as DCL's independent auditing firm. In December 1971, Price Waterhouse informed DCL that it intended as of then to qualify its opinion of DCL's 1971 financial statements by making its opinion

"subject to the ability of the Company to fully recover the cost of its computer equipment by lease renewals, by attracting new lessees and by sale of equipment."

This became a subject of dispute that was to lead soon to severance of the relationship. DCL requested, perhaps demanded, that Price Waterhouse study DCL's portfolio, remarketing program, and depreciation schedule, as well as the computer leasing industry in general, in order to recommend steps which would enable Price Waterhouse to avoid qualifying its opinion. Price Waterhouse declined to do so, however, maintaining that its position rested upon considerations pervading the computer leasing industry rather than factors peculiar to DCL. As has been noted, DCL discharged Price Waterhouse on February 15, 1972, having theretofore (1) obtained the opinion of Touche Ross & Co. that there was no reason for DCL to change its policies concerning its portfolio of System/360 computers and (2) arranged for the services of Lybrand, Ross Bros. & Montgomery as independent auditors. The latter firm ultimately certified DCL's 1971 figures without any qualification of the kind Price Waterhouse had contemplated.

The problems of new leases and remarketing as they affected companies like DCL appear not to have been secret during the period here in question and for some time before that. For example, such articles as "Computer-Leasing Firms Officer Discounts by Gambling on Long Lives for Machines" and "Computer Lessors Worried About Rental of Their Old Machines, Threat of New Ones," as well as others describing the industry structure and remarketing efforts, appeared in the Wall Street Journal on various dates in 1967, 1968, and 1970, and in the August 1968 issue of Datamation, an industry magazine. In addition, DCL's published statements, e.

g., its original prospectus of August 27, 1968, its 1970 Annual Report, and a March 1, 1971, listing application to the American Stock Exchange, stressed remarketing problems. Nevertheless, plaintiff's claim focuses on:

 (1) the failure to mention this problem at the key times involved here, and, seemingly more importantly,

 (2) the failure to mention on February 8, 1972, Price Waterhouse's intention to qualify upon grounds of this concern its certification of the 1971 figures.

The importance of the date February 8, 1972, for this lawsuit results from the fact that DCL on that day announced *unaudited* figures showing earnings per share of 96 cents for 1971 as compared with 48 cents for the prior year. "No mention was made that defendant Price Waterhouse had stated to defendant DCL that such earnings should be accompanied by a warning to investors that they were subject to the ability of defendant DCL to remarket certain of its inventory items."[1] The cheerful 1971 figures, absent the Price Waterhouse caveat, are claimed by plaintiff to have caused the sustaining of DCL's common stock price at a level substantially higher than what it would have been had that warning cloud been exposed. Continuing his account of the alleged wrongs, plaintiff tells that DCL's annual report, issued in April 1972, finally recounted the Price Waterhouse disagreement and discharge and that, "as a direct consequence thereof, defendant DCL's common stock fell drastically in price."[2]

Upon the fuller allegations thus summarized, plaintiff makes two sets of claims:

 (1) against DCL and its directors named here as defendants for perpetrating a scheme and artifice to defraud the investing public by issuing a misleading earnings statement in order to cause DCL's common stock to trade at an artificially high price;[3] and

 (2) against Price Waterhouse for failing to "take steps to inform the public that the financial information disseminated by defendant DCL was, in its opinion, incomplete and misleading."[4]

There are now presented three motions: one by plaintiff for a determination under Fed.R.Civ.P. 23(c) that this is a proper class action and two motions by defendants for summary judgment dismissing the complaint. For reasons hereinafter outlined, the complaint will be dismissed as against Price Waterhouse, but the suit will be allowed to proceed as a class action against the remaining defendants.

1. Plaintiff, in a letter to this court, originally characterized the issue of Price Waterhouse's liability as being one solely of law, concerning the duties and responsibilities of an independent auditor to the investing public. Now, however, plaintiff contends that his position is based upon several material and disputed factual assumptions—namely whether Price Waterhouse was still DCL's independent auditor at the time of DCL's earnings release; whether, in connection with its work for DCL, Price Waterhouse had obtained sufficient information to cause it to qualify its opinion; and whether Price Waterhouse performed services in connection with the earnings release.

Contrary to plaintiff's assertion, these subjects are either not issues or not material. As DCL's own documents (e. g., the 8–K form filed with the SEC on February 28, 1972) demonstrate, Price Waterhouse remained as DCL's independent

---

1. Complaint, par. 4(b).

2. *Id.*, par. 8(a).

3. In addition, one director defendant is charged with knowingly selling shares of DCL common stock during the time it was trading at an artificially high price and thus improperly profiting.

4. Complaint, par. 9.

auditor until February 15, 1972, when it was fired by DCL: Secondly, it is, for reasons hereinafter outlined, neither important not disputed that Price Waterhouse had reasons it deemed sufficient (though others disagreed) to warrant a qualification. Finally, plaintiff offers no support whatsoever for his contention, which he raised for the first time in the papers opposing the motion for summary judgment, that Price Waterhouse prepared the earnings figures released by DCL. Nor—what is dispositive in any case—does he even allege that the figures were erroneous. In any event, as can be seen from the discussion which follows, the issue is not material. The question of Price Waterhouse's liability is ripe for decision now.

Plaintiff seeks to hold this defendant liable either on the theory that (1) as DCL's auditor Price Waterhouse owed investors an independent duty to come forward, after DCL's press release, and disclose its intended qualification or (2) Price Waterhouse's failure to disclose the proposed qualification aided and abetted DCL's market manipulation.[5] Both theories are bottomed on plaintiff's contention that the "investing public * * * had the right to infer that the 1971 earnings reported therein accurately reflected defendant Price Waterhouse's opinion as to earnings."[6]

 The parties agree that mere possession and nondisclosure of material facts does not alone create liability under Rule 10b–5; there must be, in addition, some relationship which generates a duty to inform. *Rothschild v. Teledyne, Inc.*, 328 F.Supp. 1054 (N.D.Ill. 1971); *Phillips v. Reynolds & Co.*, 294 F.Supp. 1249 (E.D.Pa.1969). In this case plaintiff contends that Price Waterhouse's duty arose from its status as DCL's independent auditor, making it responsible not just to its employer but

to all persons relying on its figures. There is, however, no basis in principle or authority for extending an auditor's duty to disclose beyond cases where the auditor is giving or has given some representation or certification. Where it gives an opinion or certifies statements, an auditing firm publicly assumes a role that carries a special relationship of trust vis-à-vis the public. The auditor in such a case holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable. See, e. g., *Drake v. Thor Power Tool Co.*, 282 F.Supp. 94 (N.D.Ill.1967); *In the Matter of Touche, Niven, Bailey & Smart*, 37 SEC 629 (1957). See also Note, Accountants' Liabilities for False and Misleading Financial Statements, 67 Colum.L.Rev. 1437 (1967). The importance of the act of certifying is such that a continuing duty to disclose has been imposed where the auditor learns facts revealing that a certification believed correct when issued was actually unwarranted. *Fischer v. Kletz*, 266 F. Supp. 180 (S.D.N.Y.1967).

 In the vitally different circumstances of this case, Price Waterhouse issued no public opinion, rendered no certification, and in no way invited the public to rely on its financial judgment at or around the time in question. The earnings information of which plaintiff complains was disclosed by DCL, which specifically noted that the figures were unaudited. The situation is utterly lacking in the kind of special relationship which has heretofore imposed on auditors a duty of disclosure. The point is highlighted by the inconsistent positions assumed by the plaintiff in this case. Observing that he is "a practicing attorney" and "a well informed, sophisticated investor,"[7] he argues that the status of independent auditor, without more, creates a duty to disclose whether or not

---

5. Aiding and abetting was not charged in the complaint, but was raised in plaintiff's papers opposing the Price Waterhouse motion for summary judgment.

6. Complaint, par. 9.

7. Memorandum in opposition, p. 1.

any opinion or certification is being rendered. On the other hand, plaintiff testified that at the time of his purchases he was not aware that Price Waterhouse had ever acted as independent auditors for DCL in connection with any of their consolidated financial statements.[8] Similarly, he did not know whether the figures he read were audited or not,[9] nor did he think this was of any consequence.[10] If an investor is sophisticated enough to care who the auditor is, he must surely care whether or not the figures he reads have been audited. He cannot acknowledge indifference to this, and then conjure up a fiction of "reliance" on which to make the auditor bear any losses (without sharing any profits) he may later have realized.

As an alternative ground for his claim, plaintiff argues that Price Waterhouse's knowing failure to come forward after DCL had released its earnings figures aided and abetted DCL's alleged 10b-5 violation. Cf. Note, Accountants' Liabilities for False and Misleading Financial Statements, *supra*, at 1446–1450. On precedents this court finds persuasive, this theory is rejected. *Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971); *Fischer v. Kletz, supra.*

In his papers opposing the motion to dismiss plaintiff argues, for the first time, that Price Waterhouse may have compiled the figures released by DCL and thus may have actively aided DCL's alleged violation. Plaintiff has testified, however, that the information on which his complaint is based was obtained from DCL's annual report and proxy materials.[11] Nowhere in these documents is there an indication that Price Waterhouse prepared the figures released by DCL. Nor has plaintiff presented any other evidence to support his speculation. Furthermore, there is no contention here that the figures were false or misleading.

■ Finally, the peculiar facts of this case make it impossible to characterize Price Waterhouse's silence and inaction as aiding and abetting. The press release, of course, labeled the figures unaudited and in no way indicated participation by Price Waterhouse. The omission complained of concerned an intent to qualify an opinion, which intent had already been disclosed to the SEC in December, 1971. Furthermore, far from there being a tacit agreement not to disclose because of mutual benefit (as, say, in the case of an accountant agreeing to certify false figures in order to retain its client), it is undisputed that Price Waterhouse was fired by DCL because of the parties' disagreement over the validity of the intended qualification.

Lastly, in dismissing the complaint against Price Waterhouse, the court notes that plaintiff offers (and we have imagined) no realistic or sensible means by which Price Waterhouse could have been expected to "disclose" the planned qualification it never had occasion or opportunity to publish. It is at least mildly perplexing to speculate on the prospect of an accountant's public attack upon a client on the occasion of being discharged by the client for a divergence of opinion on proper accounting in an area where responsible accountants could (and did) responsibly differ. We need not go so far as to say Price Waterhouse could have been sued, or denounced for ethical impropriety, in order to hold, as we do, that this defendant's "nondisclosure" may not in such circumstances be held an actionable wrong to plaintiff.

■ 2. Since we conclude at this threshold stage that the complaint will survive as against DCL,[12] it is best to

---

8. Plaintiff's deposition, p. 162.

9. Plaintiff's deposition, p. 136.

10. Plaintiff's deposition, p. 138.

11. Plaintiff's deposition, pp. 171, 173.

12. Our discussion here of "DCL" refers also to the individual defendants who are sued for their alleged responsibilities as directors and, in one instance, an insider-seller.

explain this holding in briefer, far less definitive-sounding terms. With respect to DCL, the court finds that there are, as of now, seemingly triable issues as to material facts. Such issues include, though they may not be limited to: whether Price Waterhouse's intent to qualify was effectively disclosed in fact; whether, in any event, the potential impact on DCL of the System/370 computers had been sufficiently disclosed so that potential investors were not, or should not have been, misled; whether the earnings release affected the market price of DCL stock, and whether the effect could fairly have been expected to differ if there had been the disclosure plaintiff claims was required; and whether there was a significant decline in or after April 1972 in the market price, and, if so, whether this decline was caused by the disclosure of Price Waterhouse's intended qualification.[13]

■ 3. After several modifications, plaintiff now seeks to maintain this action on behalf of a class that will include anyone who purchased DCL common stock during the period February 9, 1972, through April 28, 1972. It is undisputed that during this period 321,900 shares, of the 3,000,000 shares outstanding, were traded. Assuming each purchase was of 100 shares, the class would consist of 3200 members. Numerosity requirements are met. *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

■ Common questions of law and fact include whether the earnings release omitted to state a fact which was not public knowledge; whether this omitted fact was material; whether DCL's actions were part of a scheme to inflate artificially the market price; and whether the defendant Cook improperly profited from the sale of his shares.

■ DCL argues that in addition to damages, reliance will be an individual question, and that to "permit proof relating to the claims of persons who did not read the earnings announcement would obviously involve complicated factual issues not relevant to plaintiff's claims and would therefore seriously affect the manageability of the litigation." [14] Reliance, however, is an element of causation which plays little role in nondisclosure cases; the obligation to disclose and the withholding of a material fact suffice to establish the requisite element of causation in fact. See *Affiliated Ute Citizens of State of Utah v. United States*, 406 U.S. 128, 152–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Mills v. Electric Auto-Lite*, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969); *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 797 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). A market impact theory may replace more traditional concepts of reliance. *Siegel v. Realty Equities Corp. of N. Y.*, 54 F.R. D. 420 (S.D.N.Y.1972); *Wolfson v. Solomon*, 54 F.R.D. 584 (S.D.N.Y.1972). In any case, the question of whether each member of the class must prove he read and relied on the press release is itself a question common to all. E. g., *Siegel v. Realty Equities Corp. of N. Y.*, supra; *Wolfson v. Solomon, supra.*

---

13. DCL relies on the lack of market or media reaction to the annual report's disclosures to demonstrate the lack of materiality of the omitted notice of qualification. While plaintiff's papers raise factual questions which cannot be resolved on the papers now before the court, e. g., whether there was a gradual leaking of information concerning Price Waterhouse's intended qualification prior to the annual report, the remarkable steadiness of the market price for DCL common stock in the week before and after the annual report's issuance strongly suggests that the earlier omission may ultimately be found to have been lacking in materiality. On the other hand, DCL's claim of immateriality may not be advanced by the evidently undisputed evidence that DCL strongly opposed the projected qualification and dismissed Price Waterhouse for insisting upon it.

14. Memorandum in support of cross-motion, p. 24.

Plaintiff appears to have demonstrated the predominance of common questions. If it is later determined that individual reliance on the omission may be an important element of the proof and/or that there is a significant difference between those who read the announcement and those who did not, Rule 23 affords sufficient flexibility in terms of redefining the class and creating subclasses.

■ Plaintiff's claims seem typical, and plaintiff will adequately represent the class. Since plaintiff contends the market was artificially inflated until the disclosures of the annual report, DCL argues that the class must be limited to those persons, like plaintiff, who bought during the relevant period and who only sold after the annual report was issued. Otherwise, according to DCL, there will be a conflict of interest among class members; in order for persons selling prior to the annual report to recover damages, they would have to establish that no inflation existed at the time of sale and, therefore, that they had not benefited from the inflation. While this argument makes sense, it does not serve to defeat the propriety of the class plaintiff proposes. Plaintiff concedes that those who sold at a profit before publication of the annual report are probably not entitled to recover. As for those selling at a loss before the annual report was issued, plaintiff contends that the 21.8% decline in the stock's price prior to the revelations of the annual report may have been due to a gradual public dissemination of previously concealed information. If so, persons selling prior to the annual report may now be claiming the difference between their purchase price in a completely inflated market and their sale price in a partially informed market. The issue of information leakage is a factual one, already noted, bearing on

essential elements of plaintiff's claim. Thus, to the extent that the drop in price does not reflect information leakage, plaintiff's own suit may fail, incidentally eliminating all conflict questions. At this point, therefore, DCL has failed to show an irreconcilable conflict of interests sufficient to preclude plaintiff from representing persons who sold before as well as those who sold after the annual report was issued.

■ DCL seeks to have the class restricted to those who purchased prior to February 28, 1972, the date on which DCL filed its form 8–K disclosing the same information later set forth in the annual report and thus, says DCL, making the knowledge public. This thesis is at least debatable. There is authority, apparently grounded in practical fact, that the 8–K form is directed primarily to the SEC and does not serve effectively as a public source of information in connection with purchases or sales. See *Lewis v. Adler*, 331 F.Supp. 1258, 1264 (S.D.N.Y.1971). In any event, it is plaintiff's contention that the information was not in fact disseminated and thus was not "disclosed." The uncertain degree of dissemination and its timing would appear to be a factual problem better determined upon a fuller presentation at trial. Cf. Cohen, *"Truth in Securities" Revisited,* 79 Harv.L.Rev. 1340, 1352 (1966). Subject to the further enlightenment such exploration may yield, the class will consist of purchasers between February 8, 1972,[15] and April 28, 1972.[16]

An order should be settled dismissing the complaint as against Price Waterhouse. The motion for summary judgment on behalf of the other defendants is denied. These defendants, against whom the case will proceed as a class action, and the plaintiff are directed to submit to the court proposed forms of notice to comply with Fed.R.Civ.P. 23.

15. Although plaintiff uses February 9, 1972 as being the date he read of DCL's earnings in the Wall Street Journal, DCL issued the initial press release on February 8, 1972.

16. While the annual report was issued on April 24, 1972, some period should be allowed for dissemination of the information contained therein.

Notice will be given individually to each member of the class, with the costs to be borne by plaintiff. Further views or suggestions as to management of the case on behalf of a class may be submitted along with the proposed forms of notice. All such submissions should be served and filed by July 9, 1973. Thereafter, as speedily as possible, the court will enter an appropriate order, after consultation with counsel, conformable to Fed.R.Civ.P. 23 and our own Civil Rule 11A.