CREDIT ALLIANCE CORPORATION et al., Respondents, v ARTHUR ANDERSEN & CO., Appellant.

First Department, May 3, 1984

APPEARANCES OF COUNSEL

*Robert L. King* of counsel (*John S. Kiernan* and *Charles W. Boand* with him on the brief; *Debevoise & Plimpton* and *Wilson & McIlvaine,* attorneys), for appellant.

*Melvyn I. Weiss* of counsel (*Jerome M. Congress* and *Elizabeth A. Shollenberger* with him on the brief; *Milberg Weiss Bershad Specthrie & Lerach,* attorneys), for respondents.

OPINION OF THE COURT

Ross, J. P.

I would affirm Special Term's order in its entirety.

Since the defendant elected not to answer, but rather moved to dismiss for failure to state a cause of action, the fundamental principle applies that "every fact alleged must be assumed to be true and the complaint liberally construed in plaintiff's favor" (*Barr v Wackman,* 36 NY2d 371, 375).

Plaintiffs Credit Alliance Corporation (Credit) and Leasing Service Corporation (Leasing) have their headquarters offices in New York City. They are affiliated corporations, and are both engaged primarily in financing capital equipment through installment sales and leasing programs, with manufacturers and dealers. Their specialty is serving markets that utilize income-producing and labor-saving equipment, such as that used in the construction and surface mining industries.

L. B. Smith, Inc. of Virginia (Smith) is a Virginia corporation, with its principal place of business in Maryland. Smith, a nonparty to this litigation, during the decade of the 1970's, was engaged in the business of selling, leasing, and servicing heavy construction equipment.

Before the events occurred that resulted in the instant action, Credit provided limited amounts of financing to Smith, including the purchase of chattel paper which related to transactions between Smith and its customers. Sometime prior to September, 1978, Smith asked plaintiffs to consider advancing substantial sums of credit to them. In view of the large amount of financing sought, it was obvious to plaintiffs, that if they agreed, their only viable recourse, in the event of default by Smith's customers to plaintiffs, would be to Smith.

Clarence Y. Palitz, Jr. (Palitz), was the president of each plaintiff corporation at the time relevant to the instant

action. In his affidavit in opposition to defendant's motion, Palitz states, in pertinent part, that:

"Consequently, I informed * * * Smith that it *would have to provide plaintiffs with audited * * * Smith financial statements before plaintiffs would decide whether or not to enter into further transactions with * * * Smith.* According to our records, plaintiffs received a copy of the consolidated financial statements for * * * Smith * * * After review of the 1977 certified financial statement, the decision was made to extend further financing.

"In reliance upon the 1977 certified financial statement, plaintiffs entered into numerous transactions requested by * * * Smith * * *

"Through my experience as an officer and director of Credit, Leasing and Commercial Alliance Corporation (the plaintiffs' parent company), I am knowledgeable concerning the general availability of and sources for the types and amount of financing which plaintiffs extended to * * * Smith from September 1978 through mid-1980. It is my opinion that given the amount of financing * * * involved, *a relatively limited group of companies was available to provide such financing to * * * Smith.* In addition to plaintiffs, it is my opinion that *less than eight companies* would have been potential sources of the financing sought by * * * Smith" (emphasis supplied).

The complaint, in pertinent part, alleges:

"By June 1, 1979, Credit and Leasing had provided an aggregate in excess of $15,000,000 to * * * Smith in reliance upon the 1977 certified financial statement * * *

"In 1979, *plaintiffs requested a further audited financial statement* from * * * Smith. As a result * * * Smith provided plaintiffs with a copy of the consolidated financial statements of * * * Smith and its subsidiaries as of February 28, 1979, and December 31, 1977 ('the 1979 certified financial statement') * * *

"On or about October 23, 1980 * * * Smith filed a petition for bankruptcy proceedings, and is presently the subject of such proceedings.

"As of October 23, 1980 * * * Smith had defaulted on obligations to Credit and Leasing in amounts exceeding

$7,900,000 and $900,000 respectively" (emphasis supplied).

The 1977 and 1979 audited certified financial statements (statements) were prepared by defendant, which is a public accounting firm, with offices in this State. Defendant "is one of the largest accounting firms in the United States * * * [and] holds itself out to the public as expert accountants, auditors and financial analysts upon *whom the public can rely*" (emphasis supplied).

After Smith defaulted on its obligations, the plaintiffs commenced this action against defendant, on or about August 4, 1981. With respect to the cause of action for negligence, plaintiff Credit seeks damages exceeding $7,900,000, and plaintiff Leasing seeks damages exceeding $900,000 from defendant. This action is based upon plaintiffs' reliance on the 1977 and 1979 statements of defendant, which plaintiffs allege were materially misleading, because of a lack of reasonable care, and negligence by defendant, in the conduct of its professional responsibilities. In particular, plaintiffs contend that, *inter alia,* defendant materially overstated the value of Smith's equipment, inventory and accounts receivable and defendant's unqualified opinion allegedly did not present the financial position of Smith, in accordance with generally accepted accounting principles. Thus, plaintiffs contend that defendant's statements failed to disclose that Smith was in serious financial trouble.

Even though defendant addressed its 1977 and 1979 statements "To the Stockholders and the Board of Directors of L. B. Smith, Inc. of Virginia" and there was no contractual relationship with plaintiffs, the plaintiffs allege that defendant knew or should have known, in view of defendant's analysis of Smith's precarious financial status, that Smith would have to submit the 1977 and 1979 statements to either plaintiffs, or to one of the limited number of companies, such as plaintiffs, that were capable of providing Smith with the massive funding it now needed to remain in business. Evidence that the sophisticated defendant was aware that it must have been the plaintiffs, is found in note 4 in the defendant's 1979 statement, where, in pertinent part, it is stated: "the Company

[Smith] was contingently liable for guaranteed customer obligations to outside financial institutions of approximately $11,100,000 as of February 28, 1979, and $295,000 as of December 31, 1977. This increase is primarily attributable to certain sales transactions which the Company entered into from October, 1978 through February, 1979. Under these transactions, the Company has guaranteed customers' obligations to outside financial institutions." The reason that defendant knew, or should have known, that it was the plaintiffs who were the source of the credit, is due to the fact that the only possible way that defendant could have verified the accuracy of this entry, was to comb Smith's financial records, where defendant would have found that *plaintiffs* had extended most of this $11,000,000. Incidentally, nowhere in the record does defendant either dispute Palitz' sworn statement that "[i]n addition to plaintiffs, it is my opinion that less than eight companies would have been potential sources of the financing sought by * * * Smith", nor does defendant deny that it was aware that plaintiffs were a major creditor of Smith during the subject period.

In view of the fact that, for the purpose of this matter, we accept, as true, plaintiffs' statement that less than eight companies would be available to finance Smith (as defendant does not dispute same), it would put plaintiffs in a position of seeking "redress, not as a mere member of the public, but as one of a settled and particularized class among the members of which the report would be circulated for the specific purpose of fulfilling the * * * arrangement." (*White v Guarente,* 43 NY2d 356, 363.)

The plaintiffs are members of a limited group to whom defendant would owe a duty, and to whom defendant knew or should have known their audit would be delivered, and relied upon.

Generally, accountants are not liable to those members of the general public, who receive their reports, but with whom they do not have a contractual relationship (*Ultramares Corp. v Touche,* 255 NY 170). However, we find that, based upon the record, in the instant case the plaintiffs, despite not having a contract, or being in direct privity with defendant, are entitled to a duty of care from defen-

dant because they are members "of a limited class whose reliance on [defendant's] audit * * * was, or at least should have been, specifically foreseen [by defendant]" (*White v Guarente, supra,* at p 362; material in brackets added).

■ Therefore, we hold that where defendant negligently prepares a financial statement, and it may reasonably be assumed that this statement was intended to induce plaintiffs to rely thereon, to plaintiffs' detriment in consequence of such reliance, and the plaintiffs sustain damages as a result of such reliance, the plaintiffs may recover — assuming, of course, that it is established that defendant's conduct was a substantial factor in causing such damages.

For many years, the leading case on the "privity requirement" in New York, and which protects professionals such as accountants from negligence suits by individuals who do not have a contractual relationship with the professional, has been *Ultramares (supra).* In *Ultramares,* the Court of Appeals found that an accountant could not be held liable, although negligent, to a party in the absence of privity. However, *Ultramares* "carefully distinguished * * * the service rendered by the professional * * * primarily for the information of a third person" (*Calamari v Grace,* 98 AD2d 74, 78).

It is obvious here that defendant's financial statement, requested of Smith by plaintiffs, was intended to facilitate the loans from plaintiffs to Smith. The plaintiffs were the beneficiaries of defendant's financial statements.

■ The defendant also argues that the plaintiffs' negligence cause of action is barred by the Statute of Limitations. Even though an action for professional malpractice is governed by CPLR 214 (subd 6) and must be brought within three years from the time of the completion of a professional's work (*Sosnow v Paul,* 43 AD2d 978, affd 36 NY2d 780), an action brought by an individual or group of individuals, not in privity with a professional such as an accountant, but whose reliance on that professional's work was forseeable, is an action for negligence and not one for malpractice. Correctly, Special Term held that the Statute of Limitations did not commence to run until September 28, 1978, when plaintiffs received the copy of the 1977 statement, which was the earliest date that plaintiffs could

have relied upon it. Applicable here is "the general rule that a cause of action for damages due to negligence accrues when the invasion of the plaintiff's personal rights occurred" (*Cubito v Kreisberg,* 69 AD2d 738, 744, affd 51 NY2d 900). Thus, in view of the fact that plaintiffs commenced this action on August 4, 1981, plaintiffs' cause of action, concerning the 1977 and 1979 statements was timely.

We believe that we need go no further than the holding that plaintiffs, as members of a particular class, have set forth a cause of action against defendant. However, since the privity rule has been rejected in several jurisdictions and accountants have been held liable to third persons, some comment is appropriate. (For example, see *Ryan v Kanne,* 170 NW2d 395 [Iowa Supreme Ct]; *Shatterproof Glass Corp. v James,* 466 SW2d 873 [Tex Ct Civ App]; *H. Rosenblum, Inc. v Adler,* 93 NJ 324; *Citizens State Bank v Timm, Schmidt & Co.,* 113 Wis 2d 376; *Rusch Factors v Levin,* 284 F Supp 85 [Dist Ct, RI].)

This departure from the privity concept is understandable, in view of the revolutionary developments in the accounting profession that have taken place in the half century since *Ultramares (supra)* was decided. Over the last 50 years a body of rules and standards have been developed, as guidelines, that recognize the accountant's public responsibility and to assure his independence from his client. In addition, the passage of the Federal securities laws have now caused the accounting profession to have a duty of reasonable care to large groups of unknown persons, with whom the accountant is obviously not in privity.

In *Ultramares (supra)* decided in 1931, and which dealt with auditors who were serving the public in a simpler time, the court expressed the view that neither the auditors nor the public regarded the auditor's work as protecting a third party with whom there was no contractual relationship; almost 60 years ago that was undoubtedly correct. Since then, the public perception of an auditor's work procedure has changed. Indeed, the accounting profession has changed considerably. In *Gold v DCL Inc.* (399 F Supp 1123, 1127 [Dist Ct, SDNY]), the court stated: "Where it gives an opinion or certifies statements, an

auditing firm publicly assumes a role that carries a special relationship of trust vis-à-vis the public. The auditor in such a case holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable."

As recently as March 21, 1984, the United States Supreme Court, in the case of *United States v Young & Co.* (__ US __ [appeal No. 82-687]) expanded the duty that an accountant, issuing financial reports, owes to the public. In the opinion for the court, Chief Justice Burger wrote: "by certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client * * * [The accountant performs a] public watchdog * * * [function and] * * * *owes ultimate allegiance to the corporation's creditors and* stockholders, as well as to *the* investing *public*" (emphasis supplied).

The law is vibrant, and the courts in New York have never hesitated to change long-established precedents, when circumstances indicated the need for such change. For example, as recently as two weeks ago, the Court of Appeals adopted a new rule of law, which, for the first time, allows family members to recover damages, for the emotional distress that they suffer, as observers to serious injury, or death, inflicted on members of their immediate family (*Bovsun v Sanperi,* 61 NY2d 219).

The time has come to protect third parties who, it is anticipated, may rely upon the accuracy of financial statements prepared by accountants. In this connection, we are informed that the Code of Ethics of the American Institute of Accountants emphasizes the accounting profession's responsibility to the public. As J. Carey, a distinguished former executive director of that institute, said: "the certified public accountant * * * [has] a moral responsibility to * * * be as mindful of the interests of strangers who may rely on his opinion as of the interests of the client who pays his fee."*

Rules, applicable in 1924, to the professional conduct of auditors, are no longer germane in 1984.

---

* Carey, Professional Ethics of Public Accounting, at p 13.

In the two certified statements herein, prepared by defendant, it is undisputed that the defendant, without qualification, attested to the financial well-being of Smith. The plaintiffs had a right to expect that these statements had been prepared with *professional skill and care.*

Accordingly, the order, Supreme Court, New York County (Edward J. Greenfield, J.), entered on June 30, 1983, which granted plaintiffs' motion to reargue, and upon reargument, denied defendant's motion to dismiss the first cause of action, and denied defendant's motion to reargue with respect to plaintiffs' second cause of action, should be affirmed, with costs and disbursements.

MILONAS, J. (dissenting). Plaintiffs are financial service companies engaged in the business of financing the purchase of capital equipment through installment sales or leasing agreements. In that connection, they provided certain loans to L. B. Smith, Inc. of Virginia, a seller and lessor of heavy construction equipment. Smith subsequently declared bankruptcy and defaulted on the sums advanced by plaintiffs. The instant suit was commenced against defendant Arthur Andersen & Company, a firm of certified public accountants which had prepared the financial statements that plaintiffs allegedly relied upon when they extended credit to Smith. It is undisputed that Andersen was retained by Smith to examine and report upon the latter's financial condition and that plaintiffs never contracted with defendant or communicated with any of its employees regarding Smith.

Plaintiffs seek to avoid operation of the rule that accountants may only be held liable for negligence against those with whom they are in privity (*Ultramares Corp. v Touche,* 255 NY 170) by asserting in the first cause of action, which is based in negligence, that Andersen knew or should have known that the financial statements in question were being utilized by Smith to induce companies such as plaintiffs to engage in financial transactions with Smith and make credit available to it. Plaintiffs contend that in *White v Guarente* (43 NY2d 356) the Court of Appeals relaxed the privity requirement to impose upon accountants a duty to audit and carefully prepare financial reports for the benefit of those in a definable, fixed and contemplated group. They

also challenge the continued viability of *Ultramares Corp. v Touche (supra)* in view of modern business conditions, arguing that commentators and other jurisdictions have revised their approach to the privity in contract standard. It is certainly true that some courts have departed from a strict privity requirement and now hold that under certain conditions, an accountant may be liable to third parties who rely upon the former's financial statements or audits when these reports are prepared without the exercise of ordinary care. (*Shatterproof Glass Corp. v James,* 466 SW2d 873 [Tex]; *Citizens State Bank v Timm, Schmidt & Co.,* 113 Wis 2d 376; *H. Rosenblum, Inc. v Adler,* 93 NJ 324; *Rhode Island Hosp. Trust Nat. Bank v Swartz, Bresenoff, Yavner & Jacobs,* 455 F2d 847 [CA 4th]; *Hochfelder v Ernst & Ernst,* 503 F2d 1100, revd on other grounds 425 US 185; *Merit Ins. Co. v Colao,* 603 F2d 654 [CA 7th], cert den 445 US 929.) However, notwithstanding the position taken by some other jurisdictions, this court is obliged to follow the rule applicable to New York State.

In *White v Guarente (supra),* the Court of Appeals simply authorized members of a limited partnership to commence an action for negligence against the accountant who had contracted with the partnership to perform an audit and prepare its tax returns. According to the court, "the services of the accountant were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components * * * The instant situation did not involve prospective limited partners, unknown at the time and who might be induced to join, but rather actual limited partners, fixed and determined" (*supra,* at p 361). Under such circumstances, the court stated, the accountant must have been aware that a limited partner would necessarily rely upon, or make use of, the audit and tax returns in order to properly prepare his or her own tax returns. Plaintiff was, thus, seeking "redress, not as a mere member of the public, but as one of a settled and particularized class among the members of which the report would be circulated for the specific purpose of fulfilling the limited partnership agreed upon arrangement." (*White v Guarente, supra,* at p 363.) The accountant therein, having

undertaken to furnish a service on behalf of the partnership, was accountable to the individual members of that partnership.

The case before us presents another situation entirely. Plaintiffs here do not belong to a particular definable group for whom the professional work was primarily intended. The financial statements prepared by Andersen were for the benefit of "the Stockholders and the Board of Directors" of Smith, and plaintiffs merely constituted two of an unknown group of the company's potential lenders. Although plaintiffs speculate that in addition to themselves, less than eight companies would have been potential sources of financing, it is to be expected that the number of available creditors would, of necessity, be finite. Regardless of how many lending institutions Smith could have applied to for funds, the fact remains that there was no privity between plaintiffs and Andersen. Moreover, plaintiffs' purported reliance upon defendant's work product in determining whether to advance credit to Smith is not sufficient to bring them within the purview of *White v Guarente* (*supra*) which did not significantly relax the privity requirements for claims founded in professional negligence. (*Calamari v Grace*, 98 AD2d 74; *Dworman v Lee*, 83 AD2d 507, affd 56 NY2d 816.) Indeed, when the Court of Appeals recently had an opportunity to reconsider this issue, the court reaffirmed the privity requirement. (*Dworman v Lee, supra*.) The law with respect to attorneys' negligence is in accord with that of accountants. (*Vernes v Phillips*, 266 NY 298; *Calamari v Grace, supra; Harder v Arthur F. McGinn, Jr., P. C.*, 89 AD2d 732, affd 58 NY2d 663; *Levine v Graphic Scanning Corp.*, 87 AD2d 755; *Cronin v Scott*, 78 AD2d 745.) The weakness in the position advanced by the majority is evident. After examining the record and searching to find some connection between plaintiffs and defendant, they ultimately conclude that plaintiffs, "despite not having a contract, or being in direct privity with defendant, are entitled to a duty of care from defendant" as a result of being members of a limited class whose reliance on the audit should have been foreseen by defendant. The opinion, in acknowledgment of the lack of privity between the parties herein, then urges the need for

a vibrant and responsive legal tradition which should not hesitate to change long-established precedents when warranted by the circumstances. I certainly agree with this proposition, but, as I have previously indicated, regardless of my personal views with respect to the privity requirement, I am constrained to adhere to the principle formulated by the Court of Appeals. This court does not have the authority to discard a rule established by the Courts of Appeals.

The opinion recently rendered by the United States Supreme Court (*United States v Young & Co.,* __ US __), from which the majority eloquently quotes, does not deal with the issue of privity. The question before the court in that case was whether tax accrual work papers prepared by an independent certified public accountant in the course of regular financial audits are subject to disclosure in response to a summons issued by the Internal Revenue Service under section 7602 of the Internal Revenue Code of 1954. (US Code, tit 26, § 7602.) In that regard, the court concluded that the accountant's work papers are not protected from disclosure by work-product immunity since "insulation of tax accrual work papers from disclosure might well undermine the public's confidence in the independent auditing process" (*supra,* at p __). It was in this connection that the court referred to the responsibility which an independent auditor owes to the public at large. However, nowhere does the Supreme Court discuss whether an allegedly aggrieved member of the public may sue the accountant in negligence — with or without privity. The language which the majority cites from *Gold v DCL Inc.* (399 F Supp 1123) is similarly taken out of context.

Consequently, Special Term should have granted defendant's motion to dismiss the first cause of action. (CPLR 3211.) Since the claim for negligence is barred for lack of privity, it is unnecessary to reach the Statute of Limitations issue.

Order of the Supreme Court, New York County (Edward J. Greenfield, J.), entered on June 30, 1983, which granted plaintiffs' motion to reargue and, upon reargument, denied defendant's motion to dismiss the first cause of action and

which also denied defendant's motion to reargue with respect to plaintiffs' second cause of action, should be modified to the extent of granting defendant's motion to dismiss the first cause of action and otherwise affirmed.

ASCH and FEIN, JJ., concur with ROSS, J. P.; MILONAS and ALEXANDER, JJ., dissent in an opinion by MILONAS, J.

Order, Supreme Court, New York County, entered on June 30, 1983, affirmed. Respondents shall recover of appellant $75 costs and disbursements of this appeal.